UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNION BLOCK ASSOCIATES, LLC, and KENNETH G. HOWELL, an individual,<br><br>    Plaintiffs,<br><br>v.<br><br>TIM KEANE, an individual; CARL MADSEN, an individual; the CITY OF BOISE; and DOES I though X,<br><br>    Defendants. | Case No. 1:24-cv-00038-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court are Defendants Carl Madsen, Tim Keane, and the City of Boise's Motion for Summary Judgment (Dkt. 53) and Plaintiffs Union Block Associates, LLC and Kenneth G. Howell's (collectively "Plaintiffs") Motion to Strike (Dkt. 64).

Upon review, and for the reasons set forth below, the Court DENIES the Motion to Strike and GRANTS in PART and DENIES in PART the Motion for Summary Judgment.[1] Furthermore, because no federal claims remain, the Court declines to retain jurisdiction and dismissing Plaintiffs' state law claims without prejudice.

---

[1] Because oral argument would not significantly aid its decision-making process, the Court will decide the motions on the briefing. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B).

MEMORANDUM DECISION AND ORDER - 1

## II. BACKGROUND

In 1996 Plaintiffs purchased the Union Block Building ("the Building") in downtown Boise. As part of the purchase agreement, Plaintiffs agreed to undertake certain renovations to ensure the 122-year-old building remained safe and usable. Plaintiffs completed many initial upgrades without incident.

In 2017, Plaintiffs began more extensive renovations including changes to the floor and ceiling height. To accomplish this, temporary "shoring" posts were placed in the basement to stabilize the building.

Beginning in the spring of 2023, Defendants[2] began expressing concerns about how long the project was taking, changes in engineers and contractors, and the sufficiency of the temporary shoring.

In the early morning hours of November 8, 2023, a fire broke out in the building. Due to apparent sabotage, the Building's automatic alarm system failed to activate. Fortuitously, however, an observant passerby reported the fire and Boise firefighters were able to extinguish the fire in short order.

Coincidentally, later that same morning Defendants received a structural report from Plaintiffs' engineer expressly disavowing any opinion as to the adequacy of the temporary shoring as that work had been completed by a prior subcontractor.[3]

---

[2] The Court refers to the three Defendants—Tim Keane, Carl Madsen, and the City of Boise—collectively as "Defendants." The City of Boise will be referred to as "the City." The Court will also use "the City" when it is unclear which Defendant acted, but it is unlikely all three Defendants were involved.

[3] To be clear, this report was not created the morning of November 8, 2023, for purposes of assessing the damage from the fire. This report was created prior to the fire as part of the renovation process and the City just happened to receive the report the same day as the fire.

MEMORANDUM DECISION AND ORDER - 2

Based upon the fire, Plaintiffs' expert's report, and their own prior concerns about safety, Defendants entered the Building and inspected it later that same day.

The next day, Defendants issued a Notice of Violation and Order to Vacate ("Notice and Order"). The Notice and Order declared the Building "dangerous" and required all tenants to immediately vacate the premises. The Notice and Order was accompanied by a Correction Notice that specified what Plaintiffs needed to correct before any tenants could return to the Building. The Notice and Order outlined a timeline for the required work and explained the procedures Plaintiffs could utilize if they wanted to appeal the decision.

On November 20, 2023, the parties discussed the matter. Defendants informed Plaintiffs they had retained an independent third-party engineer to produce a report on the soundness of the Building. Plaintiffs also indicated their intent to appeal Defendants' dangerousness determination. The parties discussed the parameters of the appeal hearing, but a consensus was not reached.

On November 23, 2023, Plaintiffs officially appealed. Defendants scheduled the appeal hearing for January 30, 2024, and provided written notice of the hearing to Plaintiffs.

On January 22, 2024, Plaintiffs filed the instant lawsuit. Dkt. 1.[4] They filed a notice of tort claim the same day.

Plaintiffs did not appear or participate at the appeal hearing on January 30, 2024—

---

[4] In their original complaint, Plaintiffs brought multiple § 1983 causes of action for deprivation of civil rights, claims for tortious interference with contractual relations and prospective economic gain, and defamation. *See generally* Dkt. 1.

MEMORANDUM DECISION AND ORDER - 3

personally or by counsel. Defendants presented their initial report to the City Council, along with the third-party engineering report they had recently commissioned (which, like the initial report, found numerous structural problems with the Building), and testimony from relevant stakeholders. Absent any argument from Plaintiffs, the City Council denied Plaintiffs' appeal and reaffirmed the prior finding of dangerousness.

On June 21, 2024, Plaintiffs filed their First Amended Complaint. Dkt. 21.[5]

On August 8, 2024, the City requested access to the Building to perform an inspection. Plaintiffs refused. On August 21, 2024, Plaintiffs filed an Emergency Motion for Protective Order asking the Court to require the City to conduct any inspection of the Building within the confines of Federal Rule of Civil Procedure 34. Dkt. 24. Two days later, on August 23, 2024, the City entered the Building and performed an inspection. On September 11, 2024, the City filed its opposition to Plaintiffs' Emergency Motion. Dkt. 25. Noting the inspection had already occurred, the City claimed the issue was moot. In a short decision, the Court agreed. Dkt. 31 (finding the issue moot but encouraging the parties to work together for any future inspections).

On October 17, 2024, the City notified Plaintiffs it would be holding a public hearing on October 29, 2024, to "consider the report of the estimated costs necessary to stabilize the Union Block Building." Dkt. 29-3. The purpose of this meeting was to explore the possibility of Defendants taking over the project, completing the necessary renovations,

---

[5] Plaintiffs asserted substantive due process, tortious interference, and defamation claims against Defendant Keane and the same for Madsen minus the defamation claim. As for the City of Boise, Plaintiffs asserted procedural due process (*Monell*) and taking claims and asked for declaratory and injunctive relief. *See generally* Dkt. 21.

and then seeking reimbursement from Plaintiffs after-the-fact.

On October 24, 2024, Plaintiffs filed another Expedited Motion for Temporary Restraining Order. Dkt. 29. This motion sought a temporary restraining order granting preliminary relief on numerous grounds. Most pressing, however, was Plaintiffs' request that the Court "prohibit the City from holding [the] public hearing on October 29, 2024 . . ." Dkt. 29-1, at 15. Plaintiffs argued the hearing was a continuation of Defendants' practice of depriving them of their due process rights. Plaintiffs also indicated a more thorough Motion for Preliminary Injunction would shortly follow.

That same day, Plaintiffs filed a Motion for Partial Summary Judgment seeking summary judgment on their due process claims because Defendants' practices and procedures were "a sham." *See generally* Dkt. 30-1.

Because of the time-sensitive nature of Plaintiffs' request regarding the public hearing, the Court expedited briefing on that issue. Dkt. 33.

In opposing Plaintiffs request to vacate the public hearing, Defendants explained the hearing was simply an opportunity for the City Council to "consider" whether it wanted to undertake the expense of repairing the Building because Plaintiffs were not keeping up with repairs. Dkt. 34, at 5. However, even if the measure passed, Defendants represented work would not immediately begin. *Id*.

The Court ultimately held the City Council meeting could proceed but—consistent with Defendants' representations—they could not begin any "actual construction or repairs, or preparations for construction or repairs, until a later time . . . ." Dkt. 38, at 6–7. In doing so, the Court denied that portion of Plaintiffs' Motion regarding the public hearing

MEMORANDUM DECISION AND ORDER - 5

but held open the remaining issues to be determined later.

As promised, on October 28, 2024, Plaintiffs filed a larger Motion for Preliminary Injunction. Dkt. 35. While Plaintiffs' motion echoed much of what was presented in the Motion for Temporary Restraining Order, it also expanded upon those issues and requested an even broader injunction. *See generally id*.

The Court consolidated briefing on the outstanding issues from the Motion for Temporary Restraining Order (Dkt. 29) with the Motion for Preliminary Injunction (Dkt. 35). Dkt. 40. It also scheduled a hearing for those motions on December 18, 2024. Dkt. 41.

On December 12, 2024, it was Defendants turn to file an Expedited Motion for Temporary Restraining Order. Dkt. 48. It came to Defendants' attention that work was occurring in the Building. *See generally id*. Defendants were unaware of the work and did not think the correct permits were in place. Again, the Court requested an expedited response. Dkt. 49. Plaintiffs responded by explaining the work being done was at the behest of the Ada County Highway District ("ACHD") on the alley *behind* the Building, that ACHD had indicated the matter was exclusively within its purview, and that no City permits were needed. Dkt. 50.

The Court held oral argument on December 18, 2024. First, the parties confirmed the ACHD work was under control and a non-issue. The parties also presented arguments on their various motions and requested the Court assist them in moving this matter forward. Dkt. 52. The Court took the matters under advisement.

On January 7, 2025, Defendants filed the instant Motion for Summary Judgment. Dkt. 53.

MEMORANDUM DECISION AND ORDER - 6

On January 30, 2025, the Court issued a Memorandum Decision and Order (the "Decision") on Plaintiffs' Motions for Temporary Restraining Order and Preliminary Injunction. Dkt. 55. The Court began by explaining the relief Plaintiffs sought did not precisely line up with their causes of action. *Id*. at 11–12. This complicated the Court's inquiry into whether Plaintiffs had a likelihood of success on any of their claims for purposes of granting urgent relief. The best way to describe Plaintiffs' Motions—and really, the whole posture of the case at that point—was that the parties needed the Court's help. Simply put, they could not get along.

The Court's primary concern, however, was that it was in a "procedurally difficult position" because the parties were filing motions (including summary judgment motions) while discovery was ongoing. *Id*. at 20. Thus, the Court was faced with motions where the standard was one of a preliminary nature (and typically based on limited discovery) and yet discovery was already underway and motions for summary judgment (based on that discovery) were being briefed.

Plaintiffs' emergency Motions at that time focused almost exclusively on their due process claim and the idea that the City had (previously) and was (currently) not affording them adequate due process. Ultimately, the Court held Plaintiffs had not shown they were likely to succeed on their due process claim as it related to what happened originally because the City provided a process and Plaintiffs' failure to engage in the process undercut their claims. *See generally id*. at 14–19. Ultimately, the Court did not grant any emergency relief on Plaintiffs' actual claims. But it had, through various other decisions and discussions, granted some of Plaintiffs' (and Defendants') requests. Likewise, even though

MEMORANDUM DECISION AND ORDER - 7

the Court did not award any emergent relief, it felt compelled to "assist the parties in moving th[e] case along." *Id*. at 21. Although the Court was "not accustomed to taking such an active role in the day-to-day issues of" a case, the parties essentially requested assistance, and the Court felt its guidance could be helpful considering the parties were "continually at an impasse" and "hard feelings and stubborn minds" had all but ground the case to a "standstill." *Id*. at 21–22.

To that end, the Court outlined a set timeline with a series of events—such as a new inspection—the parties needed to complete to move this case towards resolution. *Id*. at 22–23. As a reminder, the Court issued its Decision on January 30, 2025.

On February 11, 2025, Plaintiffs withdrew their previously-filed Motion for Summary Judgment explaining their efforts would be best served by focusing on those assignments the Court had given them. Dkt. 56. Plaintiffs also recognized the parties' efforts could lead to additional facts that would bear on their motion. *Id*.

The parties then began working on the Court's assignments. Unfortunately, Defendant Carl Madsen died shortly thereafter (and prior to the renewed inspection). Dkt. 59. As a result, the parties requested additional time to comply with the Court's order (Dkt. 59) which the Court granted (Dkt. 60). The parties then asked the Court to "temporarily suspend" the remaining discovery deadlines pending the resolution of Defendants' Motion for Summary Judgment (Dkt. 62) which the Court also granted (Dkt. 63).

Plaintiffs then filed a Motion to Strike asking the Court not to consider certain paragraphs from a declaration by Madsen which Defendants had filed in support of their motion for summary judgment. Dkt. 64. Plaintiffs argue the Court should not consider

MEMORANDUM DECISION AND ORDER - 8

Madsen's statements because they would not be able to cross-examine him. Dkt. 64. Defendants oppose the Motion. Dkt. 65.

On January 12, 2026, Defendants filed a Notice of Supplemental Authority pointing the Court to a factually similar case out of the Eighth Circuit. Dkt. 67.

In February 2026, Plaintiffs served discovery on Defendants. Defendants refused to respond citing the Court's prior order suspending discovery. The Court held an informal discovery dispute conference. It appears the parties may not have had a "meeting of the minds" as to the breadth of their agreement regarding the outstanding discovery. Regardless, the parties agreed to wait on any discovery pending the resolution of this motion based on the Court's representation that a decision was forthcoming.

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation modified). In considering a motion for summary judgment, the Court must "view[] the facts in the non-moving party's favor." *Id.*

To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* Accordingly, the Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an

MEMORANDUM DECISION AND ORDER - 9

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

## IV. DISCUSSION

Before analyzing the Parties' summary judgment arguments, the Court will address two preliminary matters. Both deal with Defendant Madsen. First, the Court must address Plaintiffs' Motion to Strike as that determination will, of necessity, affect what the Court considers moving forward. Second, and relatedly, some thoughts on Madsen's passing.

### A. Motion to Strike (Dkt. 64)

Plaintiffs ask the Court to strike paragraphs three through five of Madsen's declaration (Dkt. 53-3). In these paragraphs, Madsen discusses his safety concerns about the Building and some of the "rough calculations" he did regarding weight loads on the shoring posts as part of his determination that the Building was dangerous. Madsen does not, however, explicitly explain what those "rough calculations" were and with his passing, there is no way to flesh those statements out. *See generally* Dkt. 64-1.

In response, Defendants make three arguments. First, they allege Plaintiffs' Motion is untimely—having been filed ten months after Madsen's declaration was filed and seven months after Madsen's passing. Second, they argue Plaintiffs have already challenged Madsen's comments in summary judgment briefing and this motion simply "retread[s] old

territory." Dkt. 65, at 2. Third, Defendants aver that, while Madsen cannot testify at trial, this is summary judgment, and the "form" of the evidence is most important. Defendants also emphasize other witnesses can testify to why the Building was closed.

First, Plaintiffs' did file this motion long after they likely could have (or even should have). But there is no formal bar to their filing at this stage. Second, while Plaintiffs may make similar arguments at summary judgment, a motion to strike is a different mechanism and Plaintiffs are entitled to litigate their case how they see fit.[6] The Court finds these two arguments from Defendants unpersuasive.

Under Rule 56(c)(2), the Court considers the contents of the evidence rather than its form. *See also Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, the evidence may be considered at summary judgment. *Id*. Nevertheless, the fact is, with Madsen's passing, his declaration (and testimony) would likely never come in at trial. Because of that, even though the "form" of his opinions is admissible at this stage, the fact they likely would be inadmissible later leads to the circular conclusion they should not be considered now.

Upon review, the Court will deny the Motion to Strike for two interrelated reasons.

First, the Court does not share Plaintiffs' concerns about the contents of Madsen's declaration. Plaintiffs argue Madsen's statements are conclusory and that he could not have

---

[6] Generally, to object to evidence at summary judgment "[t]here is no need to make a separate motion to strike." Fed. R Civ. P. 56 Advisory Committee's Note to 2010 Amendment. Motions to strike are limited to pleadings which are defined by Federal Rule 7(a). *See Albertson v. Fremont Cnty*., 834 F. Supp. 2d 1117, 1123 n.3 (D. Idaho 2011). Thus, most courts construe motions to strike as an objection pursuant to Rule 56(c)(2). *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

possibly done the kind of math necessary to reach his "rough calculation" in his head. Plaintiffs posture his mathematics "begs" multiple questions—and then list nine of their questions they think need more definite answers. Dkt. 66, at 6–7. Plaintiffs ask too much.

Madsen never claimed his math was perfect. He specifically said he did some "rough calculations." Dkt. 53-3, at 2. Madsen later explained he has training in calculating gravity loads and that it is common for inspectors to do such calculations on the fly. Dkt. 57-1. Madsen was inspecting a building where problems had already been documented— and had just caught on fire—and made a reasonable determination as to the soundness of the structure. That was his job. He is allowed to express those opinions.

Second, despite Plaintiffs' arguments to the contrary, there do appear to be other people who can testify to this exact same information: Tim Keane and Mike Jordan. All three had "conferred" regarding Plaintiffs' expert's report received after the fire on November 8, 2023. Dkt. 53-2, at 7. All three were present during the inspection. *Id*; Dkt. 42-4, at 2. And while Madsen was the one who issued the Notice on November 9, 2023, it was based on "our observations"—meaning his, Keane's, and Jordan's. Dkt. 42-4, at 2. In short, Keane and Jordan could testify to the same things as Madsen: the Building's conditions and the reasons for its closure.

For these reasons, the Court DENIES the Motion to Strike and will give Madsen's declaration the weight it deems appropriate.

## B. Madsen's Passing

Apart from letting the Court know Madsen passed away, neither party has done anything regarding that fact. This concerns the Court. Plaintiffs never state in their

MEMORANDUM DECISION AND ORDER - 12

Complaint or any briefing whether they are suing Madsen in his personal or official capacity. The Court assumes Madsen was sued in his personal capacity—while acting "under the color of state law"—as all the allegations against him are for actions he took "within the course and scope of his employment . . . ." Dkt. 21, at 2. *See also id*. at 16, 20, 22. And both parties discuss qualified immunity at length—a principle that only applies to personal capacity suits—as opposed to Eleventh Amendment immunity and official capacity suits.

The obvious problem, however, is Madsen has passed away. Do Plaintiffs intend this case to remain against Madsen's estate? Or are they planning to reformat those claims into official capacity claims? Federal Rule of Civil Procedure 25(d) outlines that, when a public officer who is a party to a lawsuit in his official capacity dies, the officer's successor is *automatically substituted* as a party, and later proceedings should be in the substituted party's name. But an official capacity suit would likely create numerous problems (e.g. the interplay between Eleventh Amendment immunity, injunctive relief, and damages).

Ultimately, the Court will not take any action on this matter sua sponte. But, as will be noted at the end of this decision, Madsen and/or his estate and/or his successor's involvement is something the parties will need to grapple with as they move forward.

The Court moves next to Defendant's summary judgment arguments.

## C. Defendants' Motion for Summary Judgment (Dkt. 53)

As before, the parties' briefs do not always track Plaintiffs' enumerated causes of action. The Court will, therefore, follow the parties' briefs which break the issues up into four areas: immunity, takings, due process, and state law.

MEMORANDUM DECISION AND ORDER - 13

### 1. *Qualified Immunity*

Defendants first contend Keane and Madsen are entitled to qualified immunity because they did not violate Plaintiffs' constitutional rights.

Qualified immunity precludes liability against a government official unless a plaintiff proves "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation modified). Once the defense of qualified immunity is raised, the plaintiff bears the burden of establishing both prongs are satisfied to defeat qualified immunity. *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017). Significantly, qualified immunity "is an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 527 (1985).

Defendants claim Plaintiffs do not have any protected property interest at issue in this case because they do not have a right to maintain a property that is a public nuisance. Plaintiffs counter Defendants are being creative with their "public nuisance" argument and that the question is more broadly whether they have a constitutional right to use their property as they see fit.

The Court agrees Plaintiffs have numerous property rights. But those rights are cabined by various limitations. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 160 (2021) (explaining property rights in the United States come with "longstanding background restrictions"). One of those restrictions relates to Government access in the event of public or private necessity. And as relevant here, "the government owes a landowner no compensation for requiring him to abate a nuisance on his property, because

MEMORANDUM DECISION AND ORDER - 14

he never had a right to engage in the nuisance in the first place." *Id*. *See also Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1030 (1992) (explaining Government action may limit a property owner's rights, but those rights cannot contravene "relevant property and nuisance principles").

The Building in this case was in some stage or repair (or disrepair) prior to November 23, 2023. The parties all agreed work needed to be done. Then a fire broke out in the Building. Madsen (and others) took action by vacating the existing tenants and effectively closing the Building to the public. Plaintiffs retained their general property interests and rights, but they did not have an interest in maintaining the Building in such a dangerous state.[7] Accordingly, Plaintiffs cannot pursue a substantive due process claim as they do not have a property interest that was deprived. Plaintiffs have no right to have the Building occupied while it is a danger or nuisance.

But even if Plaintiffs could show they had a legitimate property interest at stake, they cannot show that right was clearly established or that Keane and Madsen's actions were unreasonable.

For the purposes of qualified immunity, the relevant question is whether a reasonable official in that official's position could have believed, in light of clearly established legal principles, that his conduct was lawful. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001). As the Supreme Court has repeatedly stated, courts are "not to define

---

[7] Even assuming arguendo any property rights were even implicated, the deprivation of those rights was minimal and temporary. To be sure, it has now been many years since the incident so the duration of Plaintiffs' rights may not be as "temporary" as hoped. But the fact remains the Building can be repaired and reopened as soon as Plaintiffs finish the necessary work. Thus, even assuming their constitutional rights were implicated and impacted, Plaintiffs had a remedial solution—fix the Building.

MEMORANDUM DECISION AND ORDER - 15

clearly established law at a high level of generality." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015). The right must instead be clearly established "in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Reichle v. Howards*, 566 U.S. 658, 665 (2012). In other words, existing precedent at the time must "squarely govern[] the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104(2018). The relevant inquiry is whether existing precedent establishes "beyond debate" that the official "acted unreasonably in these circumstances." *Mullenix v. Luna*, 577 U.S. 7, 11–14 (2015). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Plaintiffs cannot show any such controlling authority or robust consensus in this case that would deprive Keane and Madsen of qualified immunity. There simply is no case in which a building official was liable for violating a building owner's substantive due process rights for declaring a building dangerous and ordering it temporarily vacated to protect the public health and safety.

For their part, Plaintiffs spend a great deal of time discussing the definition of words like "nuisance," "imminent danger," and "dangerous" and posture Defendants' flawed understanding of those words resulted in the impermissible and unconstitutional closure of the Building. Plaintiffs suggest there is a fundamental and material dispute about what those terms mean, and such precludes summary judgment on this claim. But Plaintiffs' argument misses the mark. The question is not whether the Building was *actually dangerous*; but whether Defendants believed the Building was dangerous and provided

due process for the actions they undertook.[8]

The City has adopted, in part, the 1997 Uniform Code for the Abatement of Dangerous Buildings (the "1997 ADB Code"). City Code of Boise City § 9-11-2. The purpose of this code is to provide a procedure "whereby buildings or structures which, from any cause, endanger the life, limb, health, property, safety or welfare of the general public or their occupants, may be required to be repaired, vacated or demolished." City Code of Boise City § 9-11-1. Notably, a building does not need to be wholly inoperable or collapsing to deem it a dangerous building and order it vacated. Multiple conditions, or even a singular condition or defect will suffice. *See* 1997 ADB Code, Section 302 ("…any building or structure which has *any* or all of the conditions or defects…") (emphasis added). A building that "does not constitute an immediate danger to the life, limb, property or safety of the public . . . *may be vacated*, secured and maintained against entry." 1997 ADB Code, Section 403.1.3 (emphasis added). Or, in the event a building is "immediately dangerous to the life, limb, property or safety of the public or its occupants, it *shall be ordered to be vacated*." 1997 ADB Code, Section 403.2 (emphasis added).

The ABD Code allowed Keane and Madsen to close the Building under numerous circumstances. Whether the Building was, in truth, safe or unsafe is not the relevant question. Hindsight is, as they say, 20/20. In that moment, based on all relevant and available information, Keane and Madsen deemed the Building unsafe for *numerous* reasons and determined the best course of action was to vacate and close the premises.

---

[8] As will be explained below, the Court finds Defendants did afford Plaintiffs sufficient Due Process.

MEMORANDUM DECISION AND ORDER - 17

Plaintiffs have not pointed to any authority clearly prohibiting that conduct; they simply disagree with the result.

But to reiterate, there is no constitutional right to flawless decision-making by government officials; instead, a plaintiff can only prevail on a substantive due process claim when an official lacks reasonable justification (e.g., egregious misconduct, arbitrary conduct, or clear abuse of power) for taking the challenged action. *Shanks v. Dressel*, 540 F.3d 1082, 1888 (9th Cir. 2008). As stated above, there is ample evidence in the record to support Keane's and Madsen's decision to conclude the Building met the definition of a dangerous building under the ADB and needed to be closed for the time being.

In short, Plaintiffs did not have a protected property interest in maintaining access to a dangerous Building. But even assuming they did, Plaintiffs have failed to point to any caselaw or statute indicating that right was *clearly* established at the time of the incident and that Keane and Madsen knew about it. Furthermore, Keane's and Madsen's actions were not unreasonable under the circumstances. Accordingly, Keane and Madsen are entitled to qualified immunity. Defendants' Motion for Summary Judgment is GRANTED in this respect.

### 2. *Inverse Condemnation / Taking*

Defendants next argue summary judgment is appropriate on Plaintiff's taking claim because their determination the Building was dangerous—and the subsequent vacation of tenants—did not constitute an inverse condemnation.

Plaintiffs have never asserted a takings claim–officially. In their Complaint, Plaintiffs Tenth cause of action is for injunctive relief and specifically references the City's

actions as being "a taking in violation of the 5ᵗʰ Amendment." Dkt. 21, at 23. Similarly, Plaintiffs' Eleventh cause of action is for inverse condemnation and states the City's actions have had the "effect[] [of] an unconstitutional taking." *Id*. In later briefing, however, Plaintiffs affirmatively stated they "have not asserted a takings claim against the City . . . ." Dkt. 46, at 2. Thus, by the Court's reading, there is no federal takings claim, but there is a  state-law inverse condemnation claim (which is a type of "takings" claim).

Regardless, Defendants moved for summary judgment on this claim. Plaintiffs, however, did not substantively respond.[9] A party abandons a claim when it fails to raise it in opposition to a motion for summary judgment. *Estate of Shapiro v. United States*, 634 F.3d 1055, 1060 (9th Cir. 2011). For completeness, however, the Court will briefly explain why summary judgment is appropriate on this claim.

First, an inverse condemnation action cannot be maintained unless an actual taking of private property is established. *Covington v. Jefferson Cnty*., 53 P.3d 828, 831 (Idaho 2002). There cannot be a taking—and therefore an inverse condemnation—unless a plaintiff shows a vested property right that was subject to the taking. *Zeyen v. Bonneville Joint Dist., #93*, 114 F.4th 1129, 1139–41 (9th Cir. 2024). As set forth above, Plaintiffs do not have a vested property right in maintaining a public nuisance. Accordingly, they cannot establish an actual taking of private property and, as a result, no inverse condemnation. *Covington*, 137 Idaho at 780.

---

[9] Plaintiffs mention "inverse condemnation," but only in passing to summarily state Defendants have not met their burden for summary judgment. Dkt. 54, at 4, 8. To be fair, Plaintiffs grouped their arguments against summary judgment quite broadly and asserted there are multiple factual disputes—such as the definitions of the words—that defeat summary judgment on multiple claims, including their inverse condemnation claim. As noted above, however, these disputes are not material.

MEMORANDUM DECISION AND ORDER - 19

Second, the City's action does not constitute a regulatory taking.[10] "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). Where, as here, the relevant building codes were in place at the time Plaintiffs commenced improvements, an expectation to retain occupancy when the building violates those existing codes is unreasonable.

Further, the temporary nature of the vacation of the Building means Defendants did not interfere with Plaintiffs' reasonable expectations. The regulation of the conditions of buildings for the public good "are the burdens we all must bear in exchange for the advantage of living and doing business in a civilized community." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (citation modified).

Summary judgment is appropriate on Plaintiffs' takings/inverse condemnation claims.

### 3. Due Process

Next, Defendants contend Plaintiffs cannot prevail on their due process claim because the City provided them with ample due process—some of which Plaintiffs outright rejected. The Court's analysis here will be similar to its prior analysis on this same topic. While the Court previously reviewed the facts and circumstances only for a "likelihood of success," the Court's review was quite detailed. *See* Dkt. 55, at 13–19. And, by all accounts,

---

[10] Again, while disclaimed, the language of Plaintiffs' Amended Complaint bears all the hallmarks of a regulatory takings claim so for completeness the Court also addresses this category of takings.

MEMORANDUM DECISION AND ORDER - 20

nothing has changed since that time.[11] Thus, in large part, the Court finds its preliminary holdings are sufficient to grant summary judgment to Defendants on this claim.

The Fifth Amendment to the United States Constitution provides, in relevant part, that, "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Similarly, the Fourteenth Amendment to the United States Constitution provides, in relevant part, that, "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1.

To state a procedural due process claim, a plaintiff must allege: "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process." *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). Notably, "a procedural due process claim is not complete when the deprivation occurs. Rather, the claim is complete only when the State fails to provide due process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023) (citation modified).

As discussed above, it is not entirely clear Plaintiffs had a property interest at stake in this case. Assuming they did, the Court nevertheless finds Plaintiffs have failed to show any unconstitutional deprivation.

Plaintiffs consistently—and rather summarily—state Defendants failed to provide them with due process and that, "even if Defendants' decision to condemn the Building . . . is ultimately found to have been appropriate, Defendants were **<u>still</u>** required to provide

---

[11] This is not surprising. Plaintiffs' claim that the City's prior actions violated due process is straightforward and was cabined to the immediate aftermath of the decision to close the Building. Those facts have been examined and briefed repeatedly throughout this case. In fact, both parties simply incorporated their prior briefs regarding due process in their current briefs.

MEMORANDUM DECISION AND ORDER - 21

Plaintiffs the procedural due process rights guaranteed to them by the Constitution . . . ." Dkt. 54, at 11 (emphasis in original). True. But Plaintiffs arguments about what they were supposedly denied are focused on subjective processes within larger procedures. As the Court has already stated, a Plaintiff "may disagree with the outcome of the process, or even the process itself," but unless it can point to a true constitutional deprivation, "it cannot claim to have received no process, nor can its disagreement with the process (or outcome) rise to the level of a constitutional violation." Dkt. 55, at 19 (quoting *IRWS, LLC v. Elmore Cnty.*, 709 F. Supp. 3d 1158, 1167 (D. Idaho 2023).

Plaintiffs first assert they did not receive "meaningful notice and a meaningful right to be heard" regarding Defendants' decision to close the Building. Dkt. 54, at 11. This is important because "the touchstone of procedural due process is notice and an opportunity to be heard." *Miranda v. City of Casa Grande*, 15 F.4th 1219, 1225 (9th Cir. 2021). Plaintiffs specifically claim they did not receive a pre-deprivation hearing, a "meaningful" post deprivation hearing, and that the single hearing that was held had "glaring" constitutional deficiencies. Dkt. 29-1, at 5.

The Court already held Plaintiffs were unlikely to succeed on any of these arguments (Dkt. 55, at 13–19) and now confirms Plaintiffs have not provided any more information sufficient to create a genuine issue of material fact as to whether they were deprived of any due process.

First, it is not difficult to find notice was sufficient in this case. *See* Dkt. 55, at 16. The Notice and Order listed the structural problems Madsen, Keane, and Jordan had observed in the Building. Dkt. 37-3, at 1–2. The Notice and Order further outlined why

MEMORANDUM DECISION AND ORDER - 22

those problems resulted in the Building being designated as "dangerous," and why tenants had to vacate the premises. *Id*. Finally, the Notice and Order specifically outlined how Plaintiffs could appeal the decision and the appropriate timeline. *Id*. at 2.

Second, a pre-deprivation hearing was not required in this case because of the emergent situation. The inspection giving rise to the closure happened the same day as a fire and after Defendants received a concerning report from Plaintiffs' expert.[12]

The applicable City code applies to "buildings endangering life, limb, health, property, safety or welfare of the general public or their occupants." Boise City Code § 9-11-2. No pre-deprivation process is required by the code. Such is permissible.

Due process does not always require that the state provides a hearing prior to the initial deprivation. *See Parratt v. Taylor*, 451 U.S. 527, 539–40 (1981) (overruled in part on other grounds by *Daniels v. Williams*, 474 U.S. 327, 331–31 (1986)). "[T]he necessity of quick action by the State or the impracticality of providing any meaningful pre-deprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process."

The risk of an erroneous deprivation of Plaintiffs' (assumed) property interest was low in this case because the regulations allowing for the Building's closure were narrowly tailored and provided for adequate post-deprivation due process. *See Hodel v. Virginia*

---

[12] The report concerned Defendants because Plaintiffs' expert had not addressed numerous safety concerns Defendants had raised in the months leading up to the fire—including the shoring in the building. Also, as already noted, Plaintiffs' expert disavowed responsibility for the shoring, indicating such was the responsibility of a prior subcontractor. Dkt. 42-3, at 20.

MEMORANDUM DECISION AND ORDER - 23

*Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 301–03 (1981).[13]

In this case, Madsen relied on competent evidence and exercised his discretion to temporarily close the Building. Plaintiffs were free to appeal, which they did, but to have required more *before* the closure would have placed an undue burden on Defendants. *See Gilbert v. Homar*, 520 U.S. 924, 930 (1997) ("[W]here a State must act quickly, or where it would be impractical to provide pre[-]deprivation process, post[-]deprivation process satisfies the requirements of the Due Process Clause."); *Hodel*, 452 U.S. at 300 ("Protection of the health and safety of the public is a paramount governmental interest which justifies summary administrative action.").

Third and finally, Plaintiffs' arguments about the adequacy of the post-deprivation hearing are, as the Court already stated, "hard to swallow," Dkt. 55, at 19, because Plaintiffs failed to show up at the hearing. The Court outlined other courts have found such inaction forecloses any claimed harm but stated it would not go so far as to make that finding in this case. *Id*. (*citing Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 423 (3d Cir. 2008) (holding that where an administrative appeal is sufficient and available and a plaintiff foregoes participation, a procedural due process claim is barred)).

Thus, the Court again finds Plaintiffs are not legally or administratively barred from challenging the post-deprivation hearing but does consider it a factor indicating there was not a deprivation of due process here. What's more, there is no evidence in the record that

---

[13] In *Hodel*, the Supreme Court held that a law allowing the government to issue immediate cessation orders to mines that posed an "imminent danger to the health and safety of the public" was "specific enough to control governmental action and reduce the risk of erroneous deprivation." 452 U.S. at 301. Because mine owners were afforded prompt and adequate post-deprivation hearings and the opportunity for judicial review, the law did not violate the Due Process Clause. *Id.* at 303.

MEMORANDUM DECISION AND ORDER - 24

Plaintiffs would not have received a fair opportunity at that hearing to present evidence, make arguments, and express their concerns in the way they desired. As already noted, its pure speculation what would have occurred if Plaintiffs had elected to appear at the hearing, but who knows—this lawsuit might not have even come to fruition. *See* Dkt. 55, at 18. Nobody will ever know. But the fact remains Plaintiffs have not identified any constitutional deficiencies from the post-deprivation hearing.

Having found there was adequate notice, no need for a pre-deprivation hearing, and adequate post-deprivation hearing procedures, the Court finds summary judgment is appropriately granted on Plaintiffs' procedural due process claim.

### 4. *State Law Claims*

Lastly, Defendants contend all of Plaintiffs' state law claims are barred because Plaintiffs failed to comply with the Idaho Tort Claims Act ("ITCA").

Under the ITCA "[n]o claim or action shall be allowed against a governmental entity or its employee unless the claim has been presented and filed within the time limits prescribed by this act." Idaho Code § 6-908. A claim must be filed against a city or its employee within 180 days of when the claim accrued. Idaho Code § 6-906. Once a claim is filed, the city has 90 days to approve or deny a claim. Idaho Code § 6-909. If the city takes no action within that time, the claim is deemed denied. *Id*.

Defendants contend a plaintiff may "only file a complaint . . . after that claim is either actually denied or deemed denied." Dkt. 53-1, at 19. Because Plaintiffs served their notice of tort claim on the City the same day as filing this lawsuit, Defendants claim they violated the ITCA and all their state law claims must be dismissed.

MEMORANDUM DECISION AND ORDER - 25

Plaintiffs counter that "notice" of the tort claims is a mandatory condition, but "denial" is not required. Plaintiffs cite cases in support.

Defendants reply that Idaho Code § 6-910 is plain and unambiguous: "If the claim is denied, a claimant may institute an action . . . ." They posit that "if" means denial is a condition precedent. Defendants cite cases in support.

The Court will not belabor the parties' arguments because after briefing in this case concluded, the Idaho Supreme Court answered this very question. In a suit challenging whether the requirements of the ITCA tolled the statute of limitations, the Idaho Supreme Court held that "the ITCA requirement that a [notice] be filed as a prerequisite to being able to file a court action does not create a procedural bar to filing an action until a response is received." *Bray v. Idaho Dep't of Juv. Corr.*, 564 P.3d 377, 385 (2025).

Rejecting arguments like those Defendants make in this case, the Idaho Supreme Court held such a conclusion would essentially require that the statue be revised to add the word "only" at the beginning, effectively reading as follows: "*Only* if the claim is denied, *may* a claimant institute an action in the district court." *Id*. at 384. The Idaho Supreme Court declined to take such an approach and held language from a prior case that suggested this limitation—*Madsen v. Dept. of Health and Welfare*, 779 P.2d 433 (Idaho Ct. App. 1989); which Defendants cite to for support in the instant case—was merely dicta.

To be sure, the Idaho Supreme Court was dealing with a statute of limitations question and tolling in the case before it, but their holding was clear: a response to an ITCA

MEMORANDUM DECISION AND ORDER - 26

claim is not a pre-requisite to filing a lawsuit.[14] As this was Defendants' sole argument in support of summary judgment on these claims, the Court must, of necessity, deny the same.

Thus, having granted summary judgment on Plaintiffs' federal claims, only their state claims remain. And the Court rarely (if ever) retains jurisdiction in that situation.

"With respect to supplemental jurisdiction in particular, a federal court has subject-matter jurisdiction over specified state-law claims, which it may (or may not) choose to exercise. A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citation modified); *accord Lacey v. Maricopa Cnty.*, 693 F.3d 896, 940 (9th Cir. 2012). *See also Fichman v. Media Ctr.*, 512 F.3d 1157, 1162–63 (9th Cir. 2008) ("Having granted judgment on the federal claims, the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over the state claims."); *McCoy v. Kretschmar*, 890 F.2d 420 (9th Cir. 1989) ("The district court did not abuse its discretion in declining to exercise pendent jurisdiction over the state law claims since the federal claims were dismissed by summary judgment."). When state law claims are dismissed for lack of jurisdiction, dismissal is without prejudice. *See Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1046 (9th Cir. 1994) (stating that dismissal after declining supplemental jurisdiction should be without prejudice).

---

[14] This holding aside, the Court agrees with Defendants that the purpose of the ITCA is to provide the applicable governmental entity with an opportunity to investigate and evaluate any claims *before* costly litigation. Thus, the "best practice" would be for the plaintiff to file an ITCA notice with sufficient time so the entity has an opportunity to respond before the statute of limitations runs and before litigation begins. Nevertheless, a response is not a condition precedent and the failure to obtain one does not foreclose a party from initiating suit.

MEMORANDUM DECISION AND ORDER - 27

Accordingly, consistent with its standard practices, *see, e.g., Greenup v. Morris*, No. 2021 WL 5405273, at *11 (D. Idaho Nov. 18, 2021); *Martinez-Rodriguez v. Giles*, 391 F. Supp. 3d 985, 1002 (D. Idaho 2019), rev'd and remanded on other grounds, 31 F.4th 1139 (9th Cir. 2022), the Court declines to retain jurisdiction as Idaho state court is better suited to address Plaintiffs' remaining Idaho state law claims.

A few final thoughts about the recurrent issue of this case's posture.

According to Plaintiffs, "this lawsuit challenges the adequacy and constitutionality of the administrative procedures followed by Boise City in condemning the Building and hearing the appeal of that decision . . . ." Dkt. 21, at 14. The Court has held Keane and Madsen are entitled to qualified immunity.[15] That takes care of Plaintiffs' First and Second causes of action. The Court has granted summary judgment on Plaintiffs' Due Process causes of action—counts Three and Four—and its Takings claims—counts Ten and Eleven. Counts Five through Nine are the state law tort actions which remain.[16] The Court's conclusions today address what happened. What is (or is not) currently happening is a separate issue not before the Court.

As noted, the parties sought the Court's assistance because of the acrimonious relationship between the underlying principles. The Court gave the parties' various assignments as part of its prior decision. Those assignments included an inspection, a report, and a timeline for repairs. The Court's hope was to move this case towards a

---

[15] As noted, *see infra*, the parties likely need to do something with Madsen's status as a Defendant.

[16] Count Twelve is for Attorneys' Fees and Costs. Dkt. 21, at 24. Technically speaking, even though 42 U.S.C. § 1988 allows a prevailing party in a § 1983 action to recover attorneys' fees, it is not a separate cause of action.

MEMORANDUM DECISION AND ORDER - 28

mutually-acceptable resolution. Or, at the very least, move the underlying issues forward in some fashion. However, the Court is unsure whether those assignments were ever completed, what the result was, and the current overall status of the Building. It does not know if the City has taken any further action. Or if any repairs have been done. But even assuming something happened in the interim, the time to amend the current complaint has long since passed. Plaintiffs cannot bring new claims or modify their existing claims. They brought what they brought. And their federal claims are now gone.

The Court takes its responsibility under Federal Rule of Civil Procedure 1 seriously.[17] So, the awkward procedural posture of this case—and certain outstanding questions—notwithstanding, the Court declines to retain supplemental jurisdiction over Plaintiffs' state law claims.[18]

In conclusion, summary judgment is GRANTED as to Plaintiffs' federal causes of action and DENIED as to Plaintiffs' state causes of action. The Court will not retain supplemental jurisdiction over Plaintiffs' state law claims.

## V. ORDER

1. Defendants' Motion for Summary Judgment (Dkt. 53) is GRANTED in PART and DENIED in PART as outlined above. Summary judgment is granted as to

---

[17] Rule 1 outlines that "the court and the parties" are to work in such a way as to "secure the just, speedy, and inexpensive determination of every action and proceeding."

[18] The Court is cognizant of the fact that litigation ebbs and flows, facts are developed, and circumstances change. But this case has been unique in that Plaintiffs brought claims for actions the City took (i.e. *completed* actions) but also consistently asked the Court to step in and help with *current* problems. The Court, however, is not well-suited to receiving "real-time" updates and stepping in to assist the parties. This complicates the Court's role and makes the trajectory of the case something of a "moving target."

MEMORANDUM DECISION AND ORDER - 29

Plaintiffs' federal claims because there was no due process violation, no taking, and the individual Defendants are entitled to qualified immunity. Summary judgment is denied as to Plaintiffs' state law claims because the denial of an ITCA notice is not a pre-requisite to filing suit.

2. Plaintiffs' Motion to Strike (Dkt. 64) is DENIED.

3. The Court will enter a separate judgment in accordance with Federal Rule of Civil Procedure 58.

DATED: March 31, 2026

David C. Nye
U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 30